**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| TT Trade Group LLC d/b/a POWR2, | Case No.    2:25-cv-01380-DCN |
| Plaintiff, | |
| v. | |
| Franklin Moyer, | Dept: |
| Defendant. | |

## COMPLAINT

Plaintiff TT Trade Group LLC d/b/a POWR2 ("POWR2" or the "Company"), by and through its attorneys, brings this Complaint against Defendant Franklin Moyer ("Defendant" and, together with the Company, the "Parties") and alleges as follows.

## NATURE OF THE ACTION

1.     This case arises from Defendant's willingness to break his word in pursuit of a payday.

2.     POWR2 is a commercial battery company that develops and sells energy storage technology with the stated mission of providing portable power solutions that enable companies to meet their sustainability goals.

3.     As a manufacturer in a niche industry, POWR2 relies on its sales personnel to establish trusting professional relationships with POWR2's customers.

4.     To enable its sales personnel to cultivate those relationships, and to facilitate sales for the Company, POWR2 entrusts its sales personnel with vast amounts of the Company's Confidential Information.

5.     In exchange for access to POWR2's Confidential Information and clients, and for other substantial compensation, POWR2 asks its sales personnel to sign standard non-compete and non-solicitation agreements to protect the Company from unfair competition should they choose to leave.

6.     Defendant was hired by POWR2 in 2022 as a POWR2 Sales Manager. At the inception of his employment, Defendant executed POWR2's non-compete and non-solicitation agreements in exchange for access to the Company's Confidential Information and substantial compensation.

7.     Despite his contractual obligations to the Company, Defendant recently left POWR2 to accept a position with the Company's s direct competitor, Alliance North America, Inc. ("ANA").

8.     In Defendant's final few weeks at POWR2, he began telling several POWR2 employees, including POWR2's Human Resources Director and Chief Executive Officer, that he did not care for POWR2's leadership, was planning to leave by the end of the first financial quarter of 2025, and was actively looking for positions at other companies.

9.     With Defendant's negativity about the Company continuing unabated and Defendant brazenly telling people that he was looking for other employment, POWR2 made the rational decision to part ways with Defendant.

10.     On information and belief, in his final weeks of employment at POWR2, Defendant had already begun laying the groundwork to switch over to ANA.

11.     Within weeks of being discharged by POWR2, Defendant became ANA's newest Director of Global Sales.

12.    Defendant has also solicited at least one POWR2 employee to leave POWR2 and join him at ANA, in contravention of his employee non-solicitation obligations to the Company.

13.    POWR2 has been damaged and will continue to be damaged by Defendant's deceitful conduct and unabashed willingness to eschew his commitments and duty of loyalty.

## PARTIES

14.    TT Trade Group LLC d/b/a POWR2 is a Delaware-registered limited liability company with its headquarters in Bethel, Connecticut.

15.    The owners of TT Trade Group LLC are citizens of Connecticut, New York, and New Jersey.

16.    Frank Moyer is an individual who is a citizen of the State of South Carolina.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different States and the matter in controversy exceeds $75,000.00.

18.    This Court has personal jurisdiction over Defendant because Defendant is a citizen of the State of South Carolina.

19.    Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b) because Defendant resides in the State of South Carolina and there are no other defendants.

## BACKGROUND

**A.    Moyer's Hiring and Contractual Agreements**

20.    POWR2 hired Defendant on or around August 5, 2022, as a Sales Manager. *See* Exhibit A (the "2022 Employment Agreement").

21.     When POWR2 hired Defendant, he lived in Baltimore, Maryland.

22.     In the 2022 Employment Agreement, Defendant agreed "to devote [his] full business time, attention, and best efforts to the performance of [his] duties and to the furtherance of the Company's interest." *Id.*

23.     Defendant was given significant compensation and incentives, including an annual salary of $155,000.00 and 0.2% commission on booked sales, paid on a quarterly basis. *Id.*

24.     Because of the nature of the commercial battery industry, 0.2% of revenue can result in substantial remuneration.

25.     In connection with his execution of the 2022 Employment Agreement, Defendant also signed a "Confidentiality and Proprietary Development Agreement" with the Company (the "Confidentiality Agreement." *See* Exhibit B.

26.     Section 2.2 of the Confidentiality Agreement includes a section titled "Protection of Confidential Information", which reads:

> Employee agrees that at all times during and after Employee's employment or other affiliation with the Company, Employee will hold in trust and confidence, and not disclose to any third party, all Confidential Information as well as any proprietary information or trade secrets belonging to a student, parent, or customer of the Company which Employee may learn in the course of employment. Employee shall not disclose any Confidential Information to anyone outside the Company without the approval of an authorized officer of the Company or use any Confidential Information for any purpose other than for the benefit of the Company as required by Employee's authorized duties for the Company. Employee further agrees that except as otherwise expressly authorized in writing by the OWNERS of the Company, Employee will not transmit, remove or transport any Confidential Information. At all times during Employee's relationship with the Company, Employee shall comply with all of the Company's policies or regulations relating to the protection of Confidentiality Information to the extent that such policies have been disclosed to Employee. At all times during and after Employee's employment with the Company, (a) Employee shall not use Confidential Information, or disclose Confidential Information to anyone, for any purpose, unless expressly requested to do so in the course of Employee's employment by the Company by an authorized officer of the

Company, (b) Employee shall not retain or take with Employee any Confidential Information in a Tangible Form (defined below), and (c) Employee shall immediately deliver to the Company any Confidential Information in a Tangible Form that Employee may then or thereafter hold or control. "Tangible Form" includes ideas, information or materials in written or graphic form, on a computer disc or other medium, or otherwise stored in or available through electronic, magnetic, videotape or other form. Employee acknowledges that he or she is aware that the unauthorized disclosure of Confidential Information of the Company or the confidential information of its clients may be highly prejudicial to their interests, an invasion of privacy, and an improper disclosure of trade secrets. Whenever the approval, designation, specification, or other act of the OWNERS is required under this Agreement, the OWNERS may, by written designation, authorize an agent of the Company to perform such act. Nothing herein will be construed to prohibit a disclosure that is required by law or prohibit Employee from engaging in truthful communications with a duly authorized law enforcement agency. To the extent permitted by law, Employee will provide Company advance notice of intent to disclose Confidential Information if he or she believes a disclosure is compelled by law and will allow Company a reasonable opportunity to take appropriate legal action to protect its Confidential Information.

*Id.*

27.    In Section 2.1 of the Confidentiality Agreement, the term "Confidential Information" is defined as:

all ideas, information and materials, tangible or intangible, not generally known to the public, or generally known and used within the industry in which the Company operates, or relating in any manner to the business of the Company, including but not limited to, information regarding its services (including all trade secrets and proprietary information), its personnel (including all officers, directors, employees, and contractors), its students, vendors and suppliers and all others with whom the Company did or does business that Employee learned or learns or acquires as an Employee of the Company. Confidential Information includes, but is not limited to manuals, documents, computer programs or software used by the Company, curriculum, lesson plans, financial, legal or other data, salary information, student lists and contact information, vendor lists, business referral sources, specifications, designs, inventions, processes, business or marketing plans or strategies, works in progress, all other research and development information, forecasts, financial information, and all other technical or business information.

*Id.*

28. Section 2.3 of the Confidentiality Agreement includes a section titled "Non-Interference", which reads:

> At all times during and after Employee's employment or affiliation with the Company, Employee agrees that he or she will not, directly or indirectly, (1) solicit, induce, or attempt to solicit or induce any person then known to be an employee or contractor of the Company or any of its affiliates, successors or assigns (a "Company Person") to terminate his, her or its employment or other relationship with the Company or any of its affiliates, successors or assigns for the purpose of associating with Employee, or any entity of which Employee is or becomes a partner, principal, member, shareholder, officer, director, agent, trustee, employee or consultant, or (2) otherwise encourage any Company Person to terminate his, her or its employment or other relationship with the Company or any of its Affiliates, successors or assigns for any other purpose or no purpose.

*Id.*

29. Section 2.4 of the Confidentiality Agreement includes a section titled "Non-Competition", which reads in part:

> Employee acknowledges and agrees that during the period of his or her employment with the Company, and for a period of 12 months after termination of employment with the company, except as otherwise expressly authorized in writing by the Owners of the Company, Employee will not: (a) engage in any employment or related activity other than for the Company in any business in which the Company is engaged or in which the Employee knows or has reason to believe the Company intends in engaging; [or] (b) induce any other employee or consultant to the Company to engage in any such employment or activity . . . .

*Id.*

30. In Section 6 of the Confidentiality Agreement, Defendant made certain representations about the POWR2's "Rights and Remedies Upon Breach", which include:

> Employee acknowledges and agrees that the restrictive covenants and agreements contained herein are reasonable and valid in geographic, temporal and subject matter scope and in all other respects and are necessary to protect the Company's legitimate business interests. If, however, any court subsequently determines that any of such covenants or agreements, or any part hereof, is invalid or unenforceable, the remainder of such covenants and agreements shall not thereby be affected and shall be given full effect without regard to the invalid portions.

*Id.*

31.     Defendant further agreed in Section 6 of the Confidentiality Agreement that:

If any court determines that any of the restrictive covenants and agreements, or any part thereof, is unenforceable because of the subject matter, duration or geographic scope of such provision, such court shall have the power to reduce the scope of such provision (but only to the extent necessary to make such provision enforceable) and, in its reduced form, such provision shall then be enforceable to the maximum extent permitted by applicable law.

*Id.*

32.     Defendant also agreed in Section 6 of the Confidentiality Agreement that:

In any action or proceeding brought to enforce this Agreement, the prevailing party shall be entitled to recover its attorneys' fees and costs, including expert/consultant fees and costs.

*Id.*

33.     On or around March 14, 2024, POWR2 offered, and Defendant accepted, a promotion to the position of "Sales Director, Global Accounts and NAM" ("Sales Director") and executed a new employment agreement as part of the promotion (the "2024 Employment Agreement." *See* Exhibit C.

34.     In connection with this promotion, Defendant again committed to devoting his "full business time, attention, and best efforts to the performance of your duties and to the furtherance of the Company's interest." *Id.*

35.     Defendant's compensation was increased to an annual salary of $185,000.00 with eligibility to receive a 0.75% commission on new client booked sales and a 0.65% commission on recurring client booked sales secured by Defendant. *Id.*

36.     The 2024 Employment Agreement did not impact the restrictive covenants in the Confidentiality Agreement. *See id.*

**B.     Moyer's Employment at POWR2**

- 7 -

37.     In his roles as a Sales Manager and then Sales Director, Defendant had access to POWR2's Confidential Information and trade secrets, including POWR2's pricing lists and strategies; business plans; compiled client databases (including client contact information, needs, transaction histories, and pricing sensitivities); and technical specifications for its products, among other things.

38.     Defendant was also given the opportunity to meet and develop trusting relationships with POWR2 customers during his tenure at POWR2.

39.     Indeed, Defendant was paid to develop, and was the primary employee tasked with developing goodwill and trusting relationships with POWR2 clients.

40.     Defendant succeeded at his job in this respect—he cultivated goodwill and trusting relationships with POWR2 clients while he was employed at the Company.

41.     POWR2 invested significant resources in Defendant's efforts to develop a client base while he worked at the Company.

42.     POWR2 spent large sums of money developing the products and marketing materials that formed the bases of Defendant's interactions with POWR2 clients.

43.     POWR2 reimbursed the expenses that Defendant incurred in developing his relationships with POWR2 clients, including travel and lodging, meals, and entertainment.

**D.     Moyer's Departure from POWR2**

44.     In the final months of 2024, Defendant began complaining about his employment with POWR2 to several Company employees.

45.     Defendant came to POWR2's Director of Human Resources, Cathy Padula, and told her that he was not satisfied with working at POWR2.

46.     Defendant further told Ms. Padula bluntly that he was planning to leave POWR2 by the end of the first financial quarter in 2025 and that he was *already* looking for positions at other companies.

47.     On or around December 18, 2024, Defendant met with POWR2's CEO, Toby Nunn, to discuss Defendant's continued complaints about the Company.

48.     Defendant told Mr. Nunn, "I don't think POWR2 has the leadership to take the Company where it needs to go." Defendant reiterated his intent to look for other employment.

49.     Mr. Nunn determined that it was not in POWR2's best interest to retain an employee who acted as a continual source of negativity at the Company, who openly maligned the Company's leadership, and who had very publicly announced his intention to leave. Accordingly, Mr. Nunn decided that the best course of action was to part ways with Defendant.

50.     On January 2, 2025, after POWR2 employees returned from the holidays, POWR2 informed Defendant that the Company was discharging him based on his recent discussions with Mr. Padula and Mr. Nunn regarding his dissatisfaction with the Company and his efforts to find other employment by the end of the first financial quarter of that year.

51.     Upon information and belief, Defendant had *already* begun negotiations with POWR2's direct competitor, ANA.

52.     Both ANA and POWR2 design, manufacture, and sell battery energy storage systems ("Systems") to commercial clients. ANA and POWR2 both offer small-scale and large-scale Systems, mobile energy Systems, and support services. Because ANA and POWR2 operate in a niche industry, they compete for the same customers and employees.

53.     During the week of January 19–25, POWR became aware that Defendant had already been interviewing with direct competitors.

54.     POWR2 became concerned that Defendant would accept employment with one of POWR2's direct competitors, which would constitute a breach of his Confidentiality Agreements.

55.     POWR2's concern was significantly heighted when it learned that Defendant had, on or around January 16, 2025, solicited a POWR2 executive to leave POWR2 to join Defendant at a different employer.

56.     That solicitation of a POWR2 employee was a blatant violation of Defendant's Confidentiality Agreement.

57.     POWR2's concerns were validated when, in mid-February 2025, Defendant announced on LinkedIn that he had accepted a role as Director for Global Sales at ANA.

58.     On information and belief, Defendant has already begun soliciting POWR2 customers to move their business to ANA.

59.     In exchange for significant amounts of POWR2's capital, Defendant had promised POWR2 that he would not join a direct competitor for at least twelve months after his employment at POWR2 ended. It took Defendant about six weeks to break his word.

## COUNT I
### (Breach of Contract: Employee Non-Solicitation)

60.     POWR2 repeats and realleges each and every allegation contained in the Paragraphs above as if fully set forth herein.

61.     The Confidentiality Agreement is a valid, binding, and fully enforceable contract.

62.     POWR2 has fully performed all of its obligations the Confidentiality Agreement.

63.     Under Section 2.3 of the Confidentiality Agreement, Defendant agreed that, "[a]t all times during and after [his] employment or affiliation with [POWR2]," he would not "directly or indirectly" "solicit, induce, or attempt to solicit or induce any person then known to be an employee or contractor of the Company . . . to terminate his, her or its employment or other

relationship with the Company or any of its affiliates, successors or assigns for the purpose of associating with Employee, or any entity of which Employee is or becomes a partner, principal, member, shareholder, officer, director, agent, trustee, employee or consultant" or "otherwise encourage any Company Person to terminate his, her or its employment or other relationship with the Company or any of its Affiliates, successors or assigns for any other purpose or no purpose."

64.    Defendant breached Section 2.3 by contacting and soliciting a POWR2 executive to leave POWR2 and join Defendant at another employer.

65.    Defendant intentionally engaged in this conduct to POWR2's detriment.

66.    As a proximate and foreseeable result of Defendant's contractual breach, POWR2 has suffered damages.

## COUNT II
### (Breach of Contract: Non-Compete)

67.    POWR2 repeats and realleges each and every allegation contained in the Paragraphs above as if fully set forth herein.

68.    The Confidentiality Agreement is a valid, binding, and fully enforceable contract.

69.    POWR2 has fully performed all of its obligations the Confidentiality Agreement.

70.    Under Section 2.4 of the Confidentiality Agreement, Defendant agreed that, for a period of twelve months after the termination of his employment with POWR2, he would not "engage in any employment or related activity other than for the Company in any business in which the Company is engaged or in which the Employee knows or has reason to believe the Company intends in engaging."

71.    Defendant breached Section 2.4 by accepting employment as the Director of Global Sales – Emerging Markets at ANA, which is a direct competitor of POWR2.

72.    On information and belief, Defendant has further breached Section 2.4 by soliciting POWR2 clients in his capacity as an ANA employee.

73.    Defendant intentionally engaged in this conduct to POWR2's detriment.

74.    As a proximate and foreseeable result of Defendant's contractual breach, POWR2 has suffered damages.

## COUNT III
### (Breach of Contract: Covenant of Good Faith and Fair Dealing)

75.    POWR2 repeats and realleges each and every allegation contained in the Paragraphs above as if fully set forth herein.

76.    The Confidentiality Agreement is a valid, binding, and fully enforceable contract.

77.    POWR2 has fully performed all of its obligations under the Confidentiality Agreement.

78.    Pursuant to the terms of the Confidentiality Agreement, POWR2 reasonably expected that Defendant would not discuss potential employment with POWR2's direct competitors while employed at POWR2, would not solicit POWR2's employees to terminate their employment at POWR2, would not accept employment at one of POWR2's direct competitors within twelve months of his employment at POWR2 ending, and would not solicit POWR2's clients within twelve months of his employment at POWR2 ending.

79.    Defendant injured POWR2's right to receive some or all of those benefits by, on information and belief, negotiating employment with ANA while still employed at POWR2, soliciting a POWR2 executive to terminate his employment at POWR2, accepting employment at ANA within two months of leaving POWR2, and soliciting POWR2's clients within two months of leaving POWR2.

80.     Defendant intentionally engaged in this conduct in bad faith and to POWR2's detriment, as the facts above demonstrate.

81.     As a proximate and foreseeable result of Defendant's contractual breach, POWR2 has suffered damages.

## COUNT IV
### (Breach Fiduciary Duty: Duty of Loyalty)

82.     POWR2 repeats and realleges each and every allegation contained in the Paragraphs above as if fully set forth herein.

83.     In Defendant 's roles as a Sales Manager and Sales Director, a fiduciary relationship existed between Defendant and POWR2 that gave rise to a duty of loyalty on the part of Defendant to POWR2.

84.     Defendant had an obligation to act in the best interests of POWR2 when he was employed as a POWR2 Sales Manager and Sales Director.

85.     On information and belief, Defendant breached his duty of loyalty be advancing his own interest to the detriment of POWR2 by negotiating employment with ANA while still employed at POWR2.

86.     On information and belief, Defendant engaged in those negotiations despite having contractual duties to devote his full business time, attention, and best efforts to the performance of his duties and to the furtherance of POWR2's interest. *See* Exhibits A, B.

87.     Defendant intentionally engaged in this conduct with malice, in bad faith, and to POWR2's detriment, as the facts above demonstrate.

88.     As a proximate and foreseeable result of Defendant's breach of his fiduciary duty of loyalty, POWR2 has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, POWR2 requests the following relief against Defendant:

a)    Compensatory damages for Defendant's breach of his contractual obligations, in an amount to be determined at trial, plus interest.

b)    Compensatory damages for Defendant's breach of his fiduciary duty of loyalty, in an amount to be determined at trial, plus interest.

c)    Punitive damages for Defendant's breach of his fiduciary duty of loyalty.

d)    An award of POWR2's reasonable attorneys' fees.

e)    An award of all other costs and expenses reasonably incurred by POWR2 in bringing this action; and

f)    Such other further relief as the Court may deem just and appropriate under the circumstances.


Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**


By:    /s/ *Jennifer B. Routh*
       Jennifer B. Routh ( SC Fed. ID 11765)
       500 North Capitol Street, N.W.
       Washington D.C.,  20001-1531
       Tel:  +1 202 756 8000
       Fax: +1 202 756 8087
       jrouth@mwe.com
       *Attorneys for Plaintiff*



March 5, 2025